ALMA MICHELSON, ADMINISTRATRIX AD PROSEQUEN-
DUM, RESPONDENT, v. ERIE RAILROAD COMPANY,
APPELLANT.

Submitted May 31, 1929—Decided October 14, 1929.

For the appellant, *Collins & Corbin, Edward A. Markley* and *Charles W. Broadhurst*.

For the respondent, *Alexander Simpson* and *Alex R. Desevo*.

The opinion of the court was delivered by

BLACK, J. This suit was brought to recover damages under the Death act. The trial resulted in a verdict in favor of the plaintiff. The defendant appealed and filed twelve grounds of appeal, which are argued under three heads in the appellant's brief.

*First.* Error by the trial court in refusing to nonsuit the plaintiff or direct a verdict in favor of the defendant, on the

ground that there was no evidence of any negligence alleged in the complaint, as the proximate cause of the death of the plaintiff's intestate.

*Second.* There was no proper party plaintiff.

*Third.* Error by the trial court in refusing to charge the defendant's seventh, eighth and thirteenth request to charge.

The pertinent part of the testimony in the record, on which the trial court based a refusal to nonsuit the plaintiff or direct a verdict in favor of the defendant, is as follows: On the 22d of December, 1925, the decedent was employed by the Frederick Snare Corporation. He went to the Erie railroad yard at Monmouth and Twelfth streets, Jersey City, to a car in possession and in control of the Erie Railroad Company to get some logs which were on a car. The logs were on top of two flat cars. He, with a man named Swanson, went to one of the cars to unload the logs. The logs were held by stakes and wires. There were four stakes on each side, the wires bound the stakes and held the logs. The men started to unload the logs in the usual way. After the wires were cut decedent started to chop one of the stakes. Another stake that was decayed gave way. The logs rolled out on him and killed him. If the stake had not given way he would not have been killed. While he was chopping about three-quarters of an inch on one stake, another that was decayed gave way. Two stakes broke; one was produced in court that did not break. It could be told that the stake which broke was decayed and in bad condition by inspection. The decayed condition was not a latent defect. An inspection was made by the defendant of the car and its appurtenances. If the inspection had revealed the condition, the stake could have been removed.

Gustave Swanson testified: "Well, I didn't see anything before it was off [that is, the stake] and when I looked at it, it was rotten on the inside, but you could have seen it if you looked up underneath, you could see it was rotten." * * * "If you looked underneath you could see the whole thing was rotten. *Q.* When you looked underneath it could you see it was all rotten? *A.* Underneath, yes, sir." * * *

"It was kind of reddish at the point it was sharpened, *i. e.,* on the side, it was tapered down. *Q.* Now you are indicating the bottom, the bottom was red too?" The witness—"Rotten."

By the court—"*Q.* The sides were red and the bottom was rotten?" The witness—"Yes, sir." * * * The witness— "That was rotten all the way up to where it broke, *i. e.,* the inside, it was red only a little on the sides. *Q.* How much, can you give us any idea? *A.* About four [4] inches. But inside it was all rotten?" The witness—"No, your honor, it is red when it starts to rot." * * * The witness— "That indicates [that is, the reddish condition] rot on the inside." The witness—"The wood was oak. * * * Fifteen of the logs rolled down and three of them fell on Axel Michelsen."

George Tomecke, the car inspector for the defendant, Erie Railroad Company, testified: "*Q.* How long did it take you to inspect forty cars? *A.* About an hour and a half. *Q.* In an hour and a half you inspected forty cars? *A.* Yes, sir. *Q.* And you went underneath each car? *A.* I didn't go underneath, I just got to look underneath. *Q.* Do you remember looking underneath the car containing logs of wood? *A.* Yes, sir. *Q.* And that examination was done in the night time, wasn't it? *A.* Yes, sir. *Q.* And it was dark? *A.* Yes, sir. *Q.* What light did you have to make the examination? *A.* I got a big lamp. *Q.* What did you do, go underneath and look with the aid of this lamp? *A.* Yes, sir. * * * *Q.* So that if you saw a car with stakes on the outside which appeared to be red, would that indicate to you that the stake was rotten inside, yes or no? *A.* Well, I don't know, I don't look inside, I don't know about the inside. *Q.* Would you know whether there was anything wrong by the color of that stake? *A.* No."

The duty which a railroad company owes to its employes, which receives a loaded car from another carrier, to be hauled by the company to the place of destination was examined by Mr. Justice Dixon, in the case of *Anderson* v. *Erie Railroad Co.,* 68 *N. J. L.* 647. He said: "All the authorities agree

that it requires the exercise of reasonable care for the safety of employes, but they are not all agreed as to the nature of the care demanded." A common carrier, which assumes the duty of transporting a car other than its own, is required to make such examination thereof as would be likely to discover conditions rendering a car unfit for safe transportation. This examination has been called a cursory examination. That case was cited with approval in the case of *Griffin* v. *Payne,* 95 *Id.* 490. So, it was said, in the case of *Cork* v. *Lehigh Valley Railroad Co.,* 98 *Id.* 143, a railroad company is under a legal obligation to its employes to make reasonable inspection of cars hauled over its road. No reason can be suggested why the same rule of reasonable care and inspection does not apply to the employes of the consignee, when unloading the cars.

Under the testimony in the record, we think the question of the existence of negligence and an adequate inspection were questions to be determined by the jury. It was not error by the trial court to submit the case to the jury. This disposes of the first point argued by the appellant.

The next point is—there was no proper party plaintiff. This involves the letters of administration, *Exhibit P-1,* letters of general administration granted to Alma Michelsen, the widow, on the estate of Axel Michelsen, by the deputy surrogate of Hudson county, dated January 27th, 1928. Then, on February 3d, 1928, as of January 27th, 1928, administration *ad prosequendum* was granted on the estate of Axel Michelsen to Alma Michelsen, the widow, *Exhibits P-2* and 3. These exhibits are attacked as irregular. Exceptions to the admission in evidence of these exhibits and an exception to a refusal by the trial court to strike them from the record raises the question argued. Testimony was taken in an attempt to go behind the letters, but the trial court properly held that the letters could not be collaterally attacked. 11 *R. C. L.* 78, § 75. We think the point is disposed of adverse to the defendant by our case of *Wilson* v. *Dairymen's League,* 105 *N. J. L.* 188; that case held, an amendment may be made after twenty-four calendar months

from a general administratrix to one as administratrix *ad prosequendum* under the Death act. Other cases of amendment are *Grijnuk* v. *McAdoo,* 95 *Id.* 256; *Boniewsky* v. *Polish Home of Lodi,* 103 *Id.* 323.

Third. Error by the trial court in refusing to charge the defendant's seventh and eighth request to charge. It is sufficient to say that the trial court adequately covered these points in the charge. Number twelve, a refusal to charge the defendant's thirteenth request to charge. This is not argued in the appellant's brief and therefore it is not considered.

Finding no error in the record, the judgment of the New Jersey Supreme Court is therefore affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, KALISCH, BLACK, CAMPBELL, LLOYD, CASE, BODINE, WHITE, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, DEAR, JJ. 16.

*For reversal*—None.